UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
EMPIRE STATE CARPENTERS WELFARE      **MEMORANDUM AND ORDER**
ANNUITY and APPRENTICE TRAINING FUNDS,   07-CV-2259 (DRH) (ETB)
by Patrick Morin and Joseph Olivieri as Trustees,
and SOUTH CENTRAL DISTRICT COUNCIL OF
CARPENTERS DEFINED BENEFIT FUND, by
David F. Haines and Frank Jones, as Trustees, and
the EMPIRE STATE REGIONAL COUNCIL OF
CARPENTERS, by Patrick Morin, Business Manager,

                                Plaintiffs**,**

    v.

CONWAY CONSTRUCTION OF ITHACA, INC.,

                                Defendant.
----------------------------------------------------------------X

**APPEARANCES:**

For the Plaintiffs:
Slavin & Hart, P.C.
1625 Massachusetts Avenue NW, Suite 450
Washington, D.C. 20036
By: Christopher James Schulte, Esq.

For the Defendant:
Coughlin & Gerhart, LLP
19 Chenango Street
P.O. Box 2039
Binghamton, New York 13902-2039
By: Joseph J. Steflik, Jr., Esq.

**HURLEY, Senior District Judge**:

        Plaintiffs Empire State Carpenters Welfare Annuity and Apprentice Training

Funds, by Patrick Morin and Joseph Olivieri as Trustees, and South Central District Council of

Carpenters Defined Benefit Fund, by David F. Haines and Frank Jones, as Trustees (collectively,

the "Funds"), and the Empire State Regional Council of Carpenters, by Patrick Morin, Business

Manager (the "Union")[1] (collectively with the Funds, "Plaintiffs") filed the present action against defendant Conway Construction of Ithaca, Inc. ("Conway" or "Defendant") to recover unpaid fringe benefit contributions pursuant to a collective bargaining agreement ("CBA"). Although it is undisputed that Conway is not a signatory to the CBA, Plaintiffs maintain that Conway is nevertheless bound to the CBA as a result of its conduct manifesting an intent to adopt the agreement. Both Plaintiffs and Defendant have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons that follow, the Court finds that Conway is bound to the CBA. However, because it is unclear from the present record whether Conway effectively terminated its obligations under the CBA, both motions for summary judgment are denied.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted.

Conway was incorporated in 1996 and engages in the construction business. Conway usually employs between five and ten individuals.

In November 1996, Conway signed a CBA with the Union (the "1996 Agreement") and made fringe benefit contributions to the Funds on behalf of Conway's employees who were members of the Union. The CBA provided that it expired on April 30, 1998. According to Plaintiffs, the CBA was extended through April 30, 2001, though there is no evidence that Conway ever signed an agreement extending the term of the CBA.

---

[1] The "Union" includes Empire State Regional Council of Carpenters and its predecessors.

John Conway, the Vice President of Conway, had several meetings with Union representatives from 1998 through 2003. During those meetings, he agreed to pay union wages and benefits but refused to sign any written agreement.

In 2001, the Union entered into a new CBA with the Construction Trades Employers of South Central New York, Inc. ("CTE"), a multi-employer bargaining association (the "2001 Agreement"). The 2001 Agreement was effective from May 1, 2001 through April 30, 2006. Pursuant to the terms of the 2001 Agreement, the fringe benefit contribution rates payable to the Funds by employers on behalf of carpenter employees increased from the rates in the predecessor CBA between the Union and the Construction Industry Employers Association of South Central New York. It is undisputed that Conway never became a signatory to the 2001 Agreement.

Between May 1, 2001 and April 30, 2003, Conway paid the hourly wages and the hourly fringe benefit contributions to its carpenter employees as set forth in the 2001 Agreement. In fact, at his deposition, John Conway testified that although he refused to sign the 2001 Agreement, he paid wages and benefits to his carpenter employees in accordance with that agreement "[a]s long as [he] could." (Aff. of James Versocki, dated Feb. 27, 2009 ("Versocki Aff.") Ex. 5 at 15.) In addition, Conway submitted remittance forms to the Funds on behalf of its carpenter employees along with its fringe benefit contributions. Each form provided that:

> Any signatory to this form is hereby bound to any and all
> applicable collective bargaining agreement with [the Union]
> concerning wages, hours and working conditions for the applicable
> work and is hereby bound to any Fund's documents, trust
> agreements or other similar documents.

(Versocki Aff., Ex. 3.) The remittance forms were signed by Gail Conway, President of Conway, or Sheryl Scott, the bookkeeper of Conway.

On January 31, 2003, John Conway wrote a letter to CTE providing as follows:

> Due to the increasing costs of staying in business in New York State, we will be making a decision at the end of the 1st quarter whether or not we can maintain union rates.
>
> We have been trying to keep up with the rising wages and workers' compensation rates, but we've been losing customers over the past few years. Currently there are only a few remaining in the Ithaca area willing to pay these union rates.
>
> This decision will be based on the amount of union work in the spring. At that time I will make a final decision as to whether or not we remain a union shop.
>
> . . . .

A copy of the letter was sent to the Union.

Thereafter, on April 8, 2003, John Conway notified both the Union and the CTE via letter that Conway had "reviewed the first quarter" and would "no longer be a union shop effective May 1, 2003." (*Id.* Ex. C.) After April 1, 2003, Conway ceased making fringe benefit contributions to the Funds on behalf of its carpenter employees.

At his deposition, John Conway testified that although he never signed the 2001 Agreement, he sent the January and April 2003 letters pursuant to the termination procedure set forth in Article XV of the 2001 Agreement. (Versocki Aff., Ex. 5 at 13-16.) Article XV provides as follows:

> This Agreement shall remain in full force and effect through April 30, 2006 unless written notice of intent to seek change or to amend the provisions of this Agreement shall be given in either case by the parties desiring such change or amendment at least 90 days prior to the expiration date.

4

(*Id.* Ex. 2 at 19.) Mr. Conway explained that he followed this procedure by sending a letter in January 2003 and then confirming his termination with the Union 90 days later in April 2003. (*Id.* Ex. 5 at 13.) When asked why he sent the notice, Mr. Conway responded that he had been told at a meeting by Union representatives that he "was grandfathered in forever and that they would tell [him] when [he] could stop being a contractor – [he] would be out of the union." (*Id.* at 20.)

In response to Conway's claimed termination, Plaintiffs proffer the affidavit of Michael Pavlick ("Pavlick"), a Union representative, who states that he received Conway's January and April 2003 letters. On or about that time, Pavlick attended a meeting and had several phone conversations with Mr. Conway "to discuss the issues underlying his decision to send the letters. No agreement of any kind was reached at that meeting or during those phone calls." (Aff. of Michael P. Pavlick, dated Feb. 27, 2009, ¶ 8.)

In February 2004, the Funds performed an audit of Conway's books and records for the period of January 1, 2000 through December 31, 2003 (the "2004 Audit"). The 2004 Audit found that Conway's "funds contributions are in agreement with the payroll records, therefore, no additional contributions are due for the employees for this period under review." (Versocki Aff. Ex. 4.) According to John Conway, he only agreed to the audit "because of the legal costs to oppose the audit" and because he knew his "company had fully paid its employees." (Aff. of John Conway, dated Mar. 12, 2009, ¶ 9.) In May 2007, Conway refused to

allow the Funds' auditor to examine any of Conway's books and records for the period after April 30, 2003.[2]

Plaintiffs commenced the instant action seeking to recover damages against Conway for unpaid fringe benefit contributions pursuant to the 2001 Agreement from May 1, 2003 through April 30, 2006. Plaintiffs also seek an Order compelling Conway to allow the Funds to conduct an audit of Conway's books and records to determine its compliance with the 2001 Agreement through April 30, 2006. Although Plaintiffs concede that Conway never signed the 2001 Agreement, Plaintiffs argue that Conway is nevertheless bound by its terms because it adopted the CBA by its conduct.

Conway counters that the Court lacks subject matter jurisdiction over Plaintiffs' claims. Alternatively, Conway argues that it did not adopt the 2001 Agreement but that even if the Court finds it bound by a "verbal agreement," Conway's obligations ceased as of May 1, 2003, the date Conway notified the Union that it would no longer operate as a union contractor. In support of this latter argument, Conway relies on several events which it argues demonstrate that post-April 2003, the Union took the "position that Conway . . . was a non-union contractor and non-signatory" with the Union. (Aff. of John Conway, dated Jan. 27, 2009, ¶ 9.)

First, by letter dated April 6, 2004, Pavlick notified Christopher Roe ("Roe"), a union member, that "Conway Construction has failed to sign our current working agreement" and Roe was therefore subject to disciplinary action for being "employed by a non-union contractor." (*Id.* Ex. D.)

---

[2] Although Mr. Conway's 2007 refusal indicated that he would not permit an audit for the period after April 30, 2003, according to the evidence submitted by Plaintiffs, the 2004 Audit covered the period January 1, 2000 to December 31, 2003. (*See* Versocki Aff. Ex. 4.)

Second, by letter dated October 23, 2006, Brian Notebloom ("Notebloom"), a Union representative, notified John Conway that area standards picketing would be conducted against Conway. The letter provided as follows:

> Neither this letter nor our forthcoming picketing is intended to be a request that you enter into collective bargaining with our union. Our only objective throughout the course of this dispute is to inform the public and the citizens of this area that your employees receive substandard wages and benefits, and to attempt to eliminate, by a lawful campaign with highly visible banners, the threat to fair wages and benefits that has arisen as a result of the pay practices of your firm."

(*Id.* Ex. E.) Informational picketing was thereafter conducted by members of the Union.

Lastly, in October 2006, infra-union charges were filed by the Union against Jeffrey Mann ("Mann") for working for Conway, "a non-signatory contractor." (*Id.* Ex. G.)

Plaintiffs counter that there is a distinction between a non-union and a non-signatory contractor, the former being a contractor who has never signed a CBA with a union and the latter being a contractor who the Union and Funds consider to be a Union contractor, "albeit one that has failed to update its paperwork." (Aff. of David Haines, dated Feb. 26, 2009, at ¶ 14.) Plaintiffs contend that Conway is a non-signatory contractor bound by the 2001 Agreement.

Both Plaintiffs and Defendant have moved for summary judgment. For the reasons discussed *infra*, the Court finds as a matter of law that Conway adopted the 2001 Agreement by its conduct. However, because the parties have not addressed the legal ramification of Conway's attempted May 1, 2003 termination, both Plaintiffs' and Defendant's motions for summary judgment are denied.

## DISCUSSION

**I.** *Motion for Summary Judgment: Legal Standards*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the

allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant

9

without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## II. *The Court has Subject Matter Jurisdiction over Plaintiffs' Claims*

Plaintiffs brought the instant claims pursuant to sections 502 and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132, 1145, and section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Relying on *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539 (1988),

10

Defendant argues that the Court lacks subject matter jurisdiction over Plaintiffs' claims because they fall within the exclusive jurisdiction of the National Labor Relations Board ("NLRB"). Defendant's argument is foreclosed by the Second Circuit's decision in *Brown v. C. Volante Corp.*, 194 F.3d 351 (2d Cir. 1999).

As explained in *Brown*, the Supreme Court's decision in *Advanced Lightweight* "stands only for the unremarkable proposition that the National Labor Relations Board generally has exclusive jurisdiction over unfair labor practice claims," viz. claims "that an employer has refused to bargain in good faith by failing to make post-contract benefit plan contributions [after the CBA has expired] before negotiations for a new contract reached an impasse," *Brown*, 194 F.3d at 354. *See also Advanced Lightweight*, 484 U.S. at 548 (noting that ERISA's legislative "history contains no mention of the employer's statutory duty to make postcontract contributions while negotiations for a new contract are being conducted"). Here, Plaintiffs are not asserting unfair labor practice claims. (*See* Pls.' Mem. in Supp. at 15 ("The Funds are not arguing that the defendant unlawfully failed to bargain . . . .").) Instead, Plaintiffs seek to collect "promised contributions" owed to the Funds during the pendency of the 2001 Agreement, not during negotiations after the expiration of the 1996 Agreement. (*See id.* at 14-15.) Thus, this case is controlled by *Brown* which found as follows:

> Although it is true that the Trustees' claims arise from [employer's] alleged failure to contribute to the Fund after the signed CBA expired, this does not render them per se unfair labor practice claims over which the district court lacks jurisdiction under *Advanced Lightweight*. The Trustees are not arguing that [the employer] has unlawfully refused to bargain by making unilateral changes in working conditions before reaching an impasse over a new CBA. Rather, the Trustees claim that [the employer] promised to contribute to the Fund by adopting the two CBAs that it never signed. Appellees' claims are thus clearly for

11

> "contributions [owing] in accordance with the terms and
> conditions of ... [a collective bargaining] agreement," 29 U.S.C. §
> 1145, and "violation[s] of contracts between an employer and a
> labor organization," 29 U.S.C. § 185(a), over which the district
> court has jurisdiction. *See Advanced Lightweight*, 484 U.S. at 547,
> 108 S.Ct. 830 ("The liability created by § 515 may be enforced by
> the trustees of a plan by bringing an action in federal district court.
> . . ."); 29 U.S.C. § 185(a).

*Brown*, 194 F.3d at 354.

Accordingly, to the extent Defendant seeks to dismiss this action for lack of subject matter jurisdiction, its motion is denied.

### III.  *Conway Adopted the 2001 Agreement by its Conduct*

Section 302(c)(5)(B) of ERISA requires that payments to an ERISA trust fund be made pursuant to a "written agreement with the employer." 29 U.S.C. § 186(c)(5)(B). An employer need not actually sign a CBA to satisfy the requirements of this section. *Id. See also Brown*, 194 F.3d at 355 ("[A]n unsigned, written agreement satisfies Section 302(c)(5)(B)'s 'written agreement' requirement."). Thus, although it is undisputed that Conway never signed the 2001 Agreement, it may still be bound to the terms of that agreement – "the only question is whether [Conway's] conduct manifested an intent to adopt, or agree to, the unsigned [2001 Agreement]." *Id. See also Bricklayers Local 21 of Illinois Apprenticeship and Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th Cir. 2004) ("We begin with the well-established principle that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound, . . . rather [a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement.").

In *Brown*, the employer had signed one CBA, but did not sign two subsequent CBAs. *Brown*, 194 F.3d at 353. During the six-year time period covered by those subsequent

CBAs, however, the employer submitted monthly remittance reports signed by the employer's president, which contained a phrase indicating that they were submitted in accordance with the CBA. *Id.* The employer also paid wages and contributed to the fund on behalf of its union employees at the rates specified in the CBA and allowed an audit of its books as required by the CBA even though most of the audit concerned months during which the employer was not a signatory to the CBA. Finally, the employer sent a letter to the trust funds acknowledging its responsibility to the funds. *Id.* The Second Circuit found this conduct "sufficient, absent contrary evidence, to establish as a matter of law [the employer's] intent to adopt the two unsigned CBAs." *Id.* at 355.

In an attempt to create a genuine issue of fact, the employer claimed, inter alia, that it did not pay its employees' wages based on the CBA but on information supplied to it by one of its customers. The Second Circuit rejected the employer's proffer, noting that "[t]here [wa]s no dispute . . . that [the employer] paid its employees the wage scales set forth in the unsigned CBAs." *Id.* at 356. The Circuit also found that the fact that the Union wrote to the employer requesting that it sign the CBAs and that the employer failed to do so did "not undercut [the employer's] conduct indicating that it intended to be bound by the unsigned CBAs." *Id.* Finally, the court found that although the employer's hiring of a non-Union employee may have breached the CBAs, that did not create a genuine issue of material fact as the employer "proceeded to contribute to the Fund on behalf of this employee, thus further manifesting its intent to be bound by the CBAs' trust fund provisions." *Id.* Thus, the Circuit affirmed the lower court's grant of summary judgment in favor of the trustees, finding that the

13

employer had failed to "demonstrate the existence of a genuine issue of material fact as to whether its conduct manifested an intent to adopt the unsigned CBAs." *Id.*

The current case bears marked similarities with *Brown*. Here, Conway was a signatory to the 1996 Agreement and complied with the terms of the subsequent 2001 Agreement. After the effective date of the 2001 Agreement, Conway contributed benefits and paid wages in accordance with the rates set forth therein. Conway also submitted numerous remittance forms from May 2001 through April 30, 2003, with fringe benefit payments in accordance with the 2001 Agreement, each of which contained a clause stating that Conway agreed to be bound by the terms of the then effective CBA. Finally, Conway agreed to let the Funds audit its books and records in compliance with the 2001 Agreement. Although Conway did not write a letter to the Funds explicitly acknowledging its responsibility under the 2001 Agreement, John Conway did attempt to terminate his obligations thereunder in 2003 in accordance with the CBA's termination procedure, demonstrating his assent to its terms. The Court finds that Conway's conduct is more than sufficient to manifest an intent to be bound to the 2001 Agreement, at least through April 2003 when Conway attempted to unilaterally terminate its obligations.

In an effort to raise a genuine issue of material fact on this issue, Conway points to no conduct on its behalf pre-April 2003 negating an intent to be bound by the 2001 Agreement, other than the fact that Conway consistently refused to sign the CBA. As stated in *Brown*, that argument merely restates what is undisputed, viz. that the 2001 Agreement is unsigned. It does not raise an issue of fact as to whether Conway intended to be bound by the unsigned CBA. *See Brown*, 194 F.3d at 356. Accordingly, the Court finds as a matter of law

that Conway's conduct manifested an intent to adopt the 2001 Agreement. That finding, however, does not finally resolve the issue as Plaintiffs do not address the legal ramification of Conway's attempted unilateral termination of that agreement in April 2003. As noted above, Article XV the 2001 Agreement provides that:

> This Agreement shall remain in full force and effect through April 30, 2006 unless written notice of intent to seek change or to amend the provisions of this Agreement shall be given in either case by the parties desiring such change or amendment at least 90 days prior to the expiration date.

(Versocki Aff., Ex. 2 at 19.) Defendant maintains that it followed this procedure by sending a letter to CTE and the Union in January 2003 indicating that it would make a decision by March 31, 2003 whether Conway would remain a union shop and then following up with a letter in April 2003 confirming Conway's termination with the Union as of May 1, 2003. (*Id.* Ex. 5 at 13.) Plaintiffs suggest, via the affidavit of Pavlick, that there was no agreement between the parties as to whether Conway's letters constituted an effective termination. In the Court's view, Article XV seems to lend itself to more than one interpretation. For instance, as Defendant suggests, it may be that either party has the right to terminate its obligations under the agreement prior to the CBA's expiration date as long as that party provides written notice of intent to do so "at least 90 days prior to [April 30, 2006]." (*Id.* Ex. 2 at 19.) Or perhaps the provision does not cover termination and only applies to "change[s]" and "amend[ments]" to the CBA. Alternatively, the provision conceivably could be construed to permit either party to send written notice of its intent to terminate the CBA but only as of the expiration date. Absent briefing by the parties, which have not addressed this issue, the Court cannot determine if Conway continued to be bound by the 2001 Agreement after April 30, 2003, the period for which Plaintiffs seek

15

damages and an audit. Accordingly, the parties' motions for summary judgment are denied. Should either party wish to file another motion for summary judgment on this issue, they shall follow this Court's procedure on motion practice as set forth in the Court's Individual Practice Rules.[3]

## *CONCLUSION*

For the foregoing reasons, both Plaintiffs' motion for summary judgment and Defendant's motion for summary judgment are DENIED.

**SO ORDERED**

Dated: Central Islip, NY
February 19, 2010

/s_____
Denis R. Hurley,
United States District Judge

---

[3] To the extent Defendant asserts that this issue is controlled by *Advanced Lightweight*, it is mistaken. As discussed above, that case addressed "suits seeking recovery of unpaid contributions accrued during the period between contract expiration and impasse." *See* 484 U.S. at 545. Here, the Court has already found that Conway is bound to the 2001 Agreement and the only issue is whether Conway effectively terminated its obligations thereunder. Moreover, contrary to Defendant's argument, this case does not involve the lack of an "evergreen" clause in the 1996 Agreement – a clause evidencing the parties' intent to have an expiring CBA continue for a set period of time – as Plaintiffs do not argue that Conway has a continuing obligation to be bound by the expired 1996 Agreement.

16