UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
EMPIRE STATE CARPENTERS WELFARE     **MEMORANDUM AND ORDER**
ANNUITY and APPRENTICE TRAINING FUNDS,     07-CV-2259 (DRH) (ETB)
by Patrick Morin and Joseph Olivieri as Trustees,
and SOUTH CENTRAL DISTRICT COUNCIL OF
CARPENTERS DEFINED BENEFIT FUND, by
David F. Haines and Frank Jones, as Trustees, and
the EMPIRE STATE REGIONAL COUNCIL OF
CARPENTERS, by Patrick Morin, Business Manager,

                                           Plaintiffs,

      v.

CONWAY CONSTRUCTION OF ITHACA, INC.,

                                           Defendant.
----------------------------------------------------------------X
**APPEARANCES:**

For the Plaintiffs:
LEVY RATNER, P.C.
80 Eighth Avenue, Floor 8
New York, New York 10011
By:     Owen M. Rumelt, Esq.

For the Defendant:
COUGHLIN & GERHART, LLP
19 Chenango Street
P.O. Box 2039
Binghamton, New York 13902-2039
By:     Joseph J. Steflik, Jr., Esq.


**HURLEY, Senior District Judge**:

        Plaintiffs Empire State Carpenters Welfare Annuity and Apprentice Training Funds, by

Patrick Morin and Joseph Olivieri as Trustees, and South Central District Council of Carpenters

Defined Benefit Fund, by David F. Haines and Frank Jones, as Trustees (collectively, the

"Funds"), and the Empire State Regional Council of Carpenters, by Patrick Morin, Business

Manager (the "Union") filed the present action against defendant Conway Construction of Ithaca, Inc. ("Conway") to recover unpaid fringe benefit contributions pursuant to a collective bargaining agreement. Both parties previously moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. By Memorandum & Order dated February 19, 2010 (the "February 2010 Decision"), the Court found that although Conway had never signed the collective bargaining agreement at issue, it was nonetheless bound to that agreement by virtue of its conduct, which manifested an intent to adopt the agreement. Because, however, it was unclear from the record before the Court whether Conway effectively terminated its obligations under the collective bargaining agreement, and because the parties had not briefed the issue, the Court denied both motions for summary judgment and gave the parties an opportunity to re-file.

Presently before the Court are plaintiffs' and defendant's second motions for summary judgment. For the reasons set forth below, plaintiffs' motion is granted and defendant's motion is denied.

## BACKGROUND

The material facts, drawn from the Complaint, the parties' Local 56.1 Statements and evidentiary submissions, and the February 2010 Decision, are undisputed unless otherwise noted.

Conway was incorporated in 1996 and engages in the construction business. Conway usually employs between three and six individuals. In November 1996, Conway signed a collective bargaining agreement with the Union (the "1996 CBA"), which had an effective date of June 1, 1995 and expired on April 30, 1998. John Conway, the Vice President of Conway, had several meetings with Union representatives between 1998 (when the 1996 CBA expired) and 2003. During those meetings, he agreed to pay his employees union wages and benefits but

refused to sign another written agreement.

In 2001, the Union entered into a collective bargaining agreement (the "2001 CBA") with the Construction Trades Employers of South Central New York, Inc. ("CTE"), a multi-employer bargaining association. The 2001 CBA was effective from May 1, 2001 through April 30, 2006. It is undisputed that Conway never became a signatory to the 2001 CBA. Nevertheless, between May 1, 2001 and April 30, 2003, Conway paid its employees hourly wages and fringe benefit contributions at the rates set forth in the 2001 CBA. John Conway testified at his deposition that although he refused to sign the 2001 Agreement, he paid wages and benefits to his carpenter employees in accordance with that agreement for "[a]s long as [he] could." (Feb. 2010 Decision at 3 (internal quotation marks omitted, alterations in the original).) In addition, when Conway submitted fringe benefit contributions to the Funds on behalf of its carpenter employees, he also submitted remittance forms that provided: "Any signatory to this form is hereby bound to any and all applicable collective bargaining agreement with [the Union] concerning wages, hours and working conditions for the applicable work . . . ." (*Id.* at 3-4.)

On January 31, 2003, John Conway wrote a letter to CTE (the "January 31, 2003 Letter") providing as follows:

> Due to the increasing costs of staying in business in New York State, we will be making a decision at the end of the 1st quarter whether or not we can maintain union rates.
>
> We have been trying to keep up with the rising wages and workers' compensation rates, but we've been losing customers over the past few years. Currently there are only a few remaining in the Ithaca area willing to pay these union rates.
>
> This decision will be based on the amount of union work in the spring. At that time I will make a final decision as to whether or

3

>     not we remain a union shop.
>
>     . . . .

(Aff. of John Conway, dated July 21, 2011 ("Conway Aff."), Ex. B.) A copy of this letter was sent to the Union.

Thereafter, on April 8, 2003, John Conway notified the CTE via letter (the "April 8, 2003 Letter") that: "Per our letter of January 31, 2003, we have reviewed the first quarter. We will no longer be a union shop effective May 1, 2003." (*Id.*, Ex. C.) A copy of this letter was also sent to the Union. After April 1, 2003, Conway ceased making fringe benefit contributions to the Funds on behalf of its carpenter employees. (Feb. 2010 Decision at 4.)

At his deposition, John Conway testified that although he never signed the 2001 CBA, he sent the January and April 2003 letters pursuant to the termination procedure set forth in Article XV(2) of the 2001 CBA, (*id.*), which provides as follows:

> This Agreement shall remain in full force and effect through April 30, 2006 unless written notice of intent to seek change or to amend the provisions of this Agreement shall be given in either case by the parties desiring such change or amendment at least 90 days prior to the expiration date.

(Decl. of David F. Haines, dated June 21, 2011, ("Haines June 2011 Decl.") Ex. A at 19.) Conway testified that he followed this procedure by sending a letter in January 2003 and then confirming his termination with the Union 90 days later in April 2003. (Feb. 2010 Decision at 5.) When asked why he sent these notices, Conway responded that he had been told at a meeting by Union representatives that he "was grandfathered in forever and that they would tell [him] when [he] could stop being a contractor – [he] would be out of the union." (*Id.* (internal quotation marks omitted, alterations in the original).)

4

*The Audits*

In February 2004, the Funds audited Conway's books and records for the period between January 1, 2000 and December 31, 2003. As part of the audit, Conway was required to make available certain requested financial books and records. Conway complied with all requests for the production of documents. (Pls.' 56.1 ¶ 16.) According to Conway, he only agreed to the audit "because of the legal costs [it would take] to oppose the audit." (Conway Aff. ¶ 17.) The audit uncovered no contribution deficiencies for the period between January 1, 2000 and December 31, 2003. (Decl. of Joseph W. McCarthy, dated June 20, 2011 ("McCarthy Decl."), Ex. A at 1.) In May 2007, however, Conway refused to cooperate with the Funds' second audit for the period between January 1, 2004 and December 31, 2006. (Pls.' 56.1 ¶ 17.) Specifically, Conway refused to allow the Funds' auditor to examine any of Conway's books and records for the period after April 30, 2003.

As a result, plaintiffs commenced the instant action seeking to recover damages against Conway for unpaid fringe benefit contributions pursuant to the 2001 CBA from May 1, 2003 through April 30, 2006. Plaintiffs also seek an Order compelling Conway to allow the Funds to conduct an audit of Conway's books and records to determine its compliance with the 2001 CBA through April 30, 2006. Following the commencement of this action, in February 2008, Conway agreed to comply with the auditor's request for access to the financial books and records for the period between January 1, 2004 and December 31, 2006. (*Id.*) According to the audit, defendant owes $128,931.66 in contributions for the period between January 1, 2004 and December 31, 2006. (McCarthy Decl., Ex. B at 1.)

*February 2010 Decision*

As set forth above, both plaintiffs and defendant previously moved for summary judgment. The Court found that, as a matter of law, Conway adopted the 2001 CBA by engaging in the following conduct: (1) contributing benefits and paying wages in accordance with the rates set forth in the 2001 CBA; (2) submitting numerous remittance forms to the Funds, each of which contained a clause stating that Conway agreed to be bound by the terms of the then-effective collective bargaining agreement; (3) agreeing to let the Funds audit its books and records in compliance with the 2001 CBA; and (4) utilizing the agreement's termination procedure in an attempt to terminate its obligations under the 2001 CBA. (Feb. 2010 Decision at 14.)

The Court's finding that Conway's conduct manifested an intent to adopt the 2001 CBA did not end the inquiry, however, because neither party addressed the legal ramifications of Conway's attempt – via submission of the January 31, 2003 Letter and April 8, 2003 Letter – to unilaterally terminate the 2001 CBA. The Court found that the relevant contractual provision, Article XV(2) of the 2001 CBA, "seems to lend itself to more than one interpretation." (Feb. 2010 Decision at 15.) The Court explained:

> For instance, as Defendant suggests, it may be that either party has the right to terminate its obligations under the agreement prior to the CBA's expiration date as long as that party provides written notice of intent to do so "at least 90 days prior to [April 30, 2006]." (*Id.* Ex. 2 at 19.) Or perhaps the provision does not cover termination and only applies to "change[s]" and "amend[ments]" to the CBA. Alternatively, the provision conceivably could be construed to permit either party to send written notice of its intent to terminate the CBA but only as of the expiration date. Absent briefing by the parties, which have not addressed this issue, the Court cannot determine if Conway continued to be bound by the [2001 CBA] after April 30,

6

> 2003, the period for which Plaintiffs seek damages and an audit. Accordingly, the parties' motions for summary judgment are denied. Should either party wish to file another motion for summary judgment on this issue, they shall follow this Court's procedure on motion practice as set forth in the Court's Individual Practice Rules.

(*Id.* at 15.) The parties have fully briefed the issue of whether Conway's January 31, 2003 and April 8, 2003 Letters effectively unilaterally terminated its obligations under the 2001 CBA. For the reasons set forth *infra*, the Court finds the 2001 CBA did not authorize Conway to terminate the agreement prior to its expiration, and that any interpretation to the contrary would render Article XV(2) unenforceable as contrary to federal law.

## DISCUSSION

### I.     Legal Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     Summary Judgment May be Appropriate Even When a Contractual Provision is Ambiguous

The Court notes, as an initial matter, that its prior holding regarding the ambiguity of Article XV does not automatically preclude it from awarding summary judgment here. Summary judgment is appropriate when there are no genuine issues of material fact, "a situation that obtains not only when [contractual] language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (internal quotation marks omitted); *see also Lawrence v. Cohn*, 197 F. Supp. 2d 16, 20 (S.D.N.Y. 2002) (same); *Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans v. Mauro's Plumbing, Heating & Fire Suppression Inc.*, 84 F. Supp. 2d 344, 355 (N.D.N.Y. 2000) ("Ambiguity itself is insufficient to create a genuine issue of material fact and summary judgment is appropriate if the ambiguity coupled with the extrinsic evidence does not create a genuine issue of material fact.").

On the other hand, if, however, the extrinsic evidence proffered by the parties does not resolve the contractual ambiguity, summary judgment is inappropriate. *See Stern v. Cigna Grp. Ins.*, 2008 WL 4950067, at *1 (2d Cir. Nov. 20, 2008) (finding summary judgment "inappropriate" when there was a "genuine issue of material fact as to whether extrinsic evidence could yield a conclusive answer as to the parties' intent"); *Mauro's Plumbing*, 84 F. Supp. 2d at 352 ("[I]f the contract language is ambiguous and extrinsic evidence creates a genuine issue of material fact, summary judgment is inappropriate.").

### III.     Principles Underlying the Court's Interpretation of the 2001 CBA

When interpreting a collective bargaining agreement, "traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000).  The Court must read the 2001 CBA "to give effect to all of its provisions and to render the provisions consistent with each other." *Local 205, Cmty. & Soc. Agency Employees' Union, Dist. Council 1707 AFSCME v. Day Care Council of N.Y., Inc.*, 992 F. Supp. 388, 392 (S.D.N.Y. 1998) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)).  When a provision in a collective bargaining agreement is ambiguous, the court may "look to extrinsic factors – such as bargaining history, past practices, and other provisions in the CBA – to interpret the language in question." *United Techs. Corp.*, 230 F.3d at 576.

Defendant asserts that plaintiffs drafted the 2001 CBA and, as such, any ambiguity therein must be construed against them.  (*See* Def.'s Mem. at 9.)  Defendant proffers no evidence, however, that Article XV(2) of the 2001 CBA was drafted by the Union.  By contrast, plaintiffs have set forth undisputed evidence that CTE provided the language of Article XV(2) of the 2001 CBA.  (*See* Decl. of David F. Haines, dated Aug. 10, 2011 ("Haines Aug. 2011 Decl.") ¶ 4.)

### IV.     The 2001 CBA Cannot be Interpreted to Permit Conway to Unilaterally Terminate the Agreement Prior to the Agreement's Expiration

#### A.     The Language of the 2001 CBA

Article XV(2) of the 2001 CBA provides:

> This Agreement shall remain in full force and effect through April 30,

10

> 2006 unless written notice of intent to seek change or to amend the provisions of this Agreement shall be given in either case by the parties desiring such change or amendment at least 90 days prior to the expiration date.

(Haines June 2011 Decl., Ex. A at 19.)  This provision on its face refers only to the parties' rights to "change or to amend" the agreement – there is no explicit reference to either party's right to "terminate" the agreement.

As pointed out by plaintiffs, other portions of the 2001 CBA indicate – both explicitly and implicitly – that the negotiating parties intended the agreement to be effective for a term of not less than five years.  Several provisions refer to the "expiration date" of April 30, 2006 (*id.* at Cover Page, 19) or the "term" or "life" of the agreement (*id.* at 19).  The agreement also contains a five-year schedule of wages and benefits contributions.  (*Id.* at 10-12.)  Other provisions appear to specifically foreclose either party from unilaterally terminating the agreement.  For example, Article XV(3) states that the agreement "may be opened at any time by *mutual* agreement of the *signatory parties*."  (*Id.* at 19 (emphases added); *see also id.* (Article XV(4), which provides that an employer with an "duly designated bargaining agency" will be bound by the agreement "during the life" of the agreement, even if the employer terminates designation of the bargaining agency "during the life of this Agreement").)

### B.   *Extrinsic Evidence*

#### 1.   Conway's Affidavits

Conway has submitted an affidavit stating that he understood, based upon conversations with G. David Weaver, the lead negotiator for CTE, as well as unnamed Union representatives "that Article XV(2) allowed me to withdraw from the collective bargaining agreement at any

11

time during the term of the agreement upon proper notice." (Conway Aff. ¶ 7.) Aside from failing to provide any specifics as to when such conversations occurred and which Union representatives provided him with such information, Conway's present affidavit appears to conflict with his prior affidavits submitted to this Court. Specifically, Conway previously attested that he refused to sign the 2001 CBA in the first instance because the agreement "would have run from May 1, 2001 through April 30, 2006," and he would have "never agreed to a collective bargaining agreement which would last until April 30, 2006." (Pls.' 56.1 ¶ 3 (internal quotation marks omitted).) Given this conflict, and given the vague nature of the statements set forth in the most recent Conway Affidavit, the Court finds that it is insufficient to raise a genuine issue of fact for the jury.

### 2. Affidavits of the Negotiators of the 2001 CBA

Plaintiffs have provided an affidavit of David F. Haines, a Regional Director of the Union who was involved in the negotiations of both the 2001 CBA and the subsequent collective bargaining agreement between the Union and CTE. In his affidavit, Haines states that the Union's negotiators "did not intend Article XV.2 . . . to permit a party bound by the Agreement, under any circumstance, to unilaterally effect any termination, modification or amendment of the 2001 Agreement." (Haines June 21, 2011 Decl. ¶ 6.) Haines further attests that CTE negotiators never indicated that they understood Article XV(2) to permit such unilateral termination of the agreement. (*Id.* ¶ 7.) According to Haines, when the Union and CTE negotiated a new collective bargaining agreement in 2006, they agreed upon revised wording for Article XV(2),[1] which

---

[1] The revised Article XV(2) in the collective bargaining agreement between CTE and the Union, which was effective May 1, 2006 through April 30, 2011, reads as follows:

"accurately reflect[ed] [their] joint understanding" that the version of Article XV(2) in the 2001 CBA "was intended as a mechanism to request negotiations of a new agreement prior to the then-current agreement's expiration date." (*Id.* ¶ 13.) Haines further states that no other employer bound by the 2001 CBA ever attempted to unilaterally terminate the agreement pursuant to Article XV(2). (*Id.* ¶ 10.)

These assertions, however, are directly contradicted by an affidavit submitted by G. David Weaver, the lead negotiator for CTE in connection with both the 2001 CBA and the subsequent collective bargaining agreement. According to Weaver, "Article XV(2) of the [2001 CBA] continued the prior practice of allowing signatory contractors (including contractors who had designated their bargaining rights to the CTE) to withdraw at any time upon providing notice as long as such notice was given at least ninety (90) days prior to the expiration date." (Aff. of G. David Weaver, dated July 22, 2011 ("Weaver Aff.") ¶ 4.) Weaver attests that during negotiations for the subsequent collective bargaining agreement, the Union "demanded modification of Article XV(2) to provide an 'evergreen clause' with notice within a sixty (60) to ninety (90) day window period." (*Id.* ¶ 7.) According to Weaver, this represented "a major change" from the 2001 CBA. (*Id.*)

Plaintiffs assert that defendant's interpretation of the 2001 CBA, i.e., that an employer

---

> This Agreement shall remain in full force and effect through April 30, 2011 and continue from year to year thereafter, unless written notice of intent to seek change or to amend the provisions of this Agreement shall be given in either case by the parties desiring such change or amendment 60-90 days prior to expiration date, or any subsequent anniversary dates.

(Haines June 2011 Decl., Ex. B at 17.)

could unilaterally withdraw from the 2001 CBA at any time prior to the expiration of the agreement, conflicts with well-established federal labor law. Specifically, plaintiffs cite to the decision of the National Labor Relations Board ("N.L.R.B.") in *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375 (1987), *enforced sub. nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. N.L.R.B.*, 843 F.2d 770 (3d Cir. 1988), *cert. denied*, 488 U.S. 889 (1988). At issue in *Deklewa* were "pre-hire" agreements, which are collective bargaining agreements entered into by an employer before it hires any employees. *See Building & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./Rhode Island, Inc.*, 507 U.S. 218, 230 (1993). Pre-hire agreements, like the 2001 CBA, are authorized pursuant to Section 8(f) of the National Labor Relations Act ("NLRA"). *See id.* Prior to the N.L.R.B.'s decision in *Deklewa*, a Section 8(f) pre-hire agreement "could be repudiated by either party at any time for any reason." *See Sheet Metal Workers' Int'l Ass'n v. McElroy's Inc.*, 500 F.3d 1093, 1097 (10th Cir. 2007). In *Deklewa*, however, the "NLRB overruled longstanding precedent and held that an employer may not repudiate a pre-hire agreement during the term of the contract." *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 315 n.3 (2d Cir. 1990).[2]

The Court finds that defendant's asserted interpretation of Article XV(2) of the 2001 CBA, which would permit the unilateral termination of the agreement by an employer at any time prior to the agreement's expiration, runs afoul of the rule set forth in *Deklewa*. As plaintiffs

---

[2] While the Second Circuit has never explicitly adopted *Deklewa*, its citations to that decision have been favorable and have not evidenced any disagreement with its holding. *See Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 288 F.3d 491, 496 (2d Cir. 2002) ("At the conclusion of the term of the agreement, both the employer and the union can unilaterally repudiate the § 8(f) bargaining relationship."), *vacated on other grounds*, 538 U.S. 918 (2003); *Benson*, 907 F.2d at 315 n.3. Thus, the Court declines defendant's invitation to disavow the holding of *Deklewa*. (*See* Def.'s Mem. at 7.)

correctly point out, it is well-settled that "ambiguously worded contracts should not be interpreted to render them illegal and unenforceable . . . ." *N.L.R.B. v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 202 (2d Cir. 2003) (internal quotation marks omitted). Here, however, defendant has submitted extrinsic evidence – in the form of Weaver's affidavit – that the CTE and the Unions, in negotiating Article XV(2) of the 2001 CBA, intended that provision to have the illegal effect of "continu[ing ] the prior practice of allowing signatory contractors . . . to withdraw at any time upon providing notice . . . at least ninety (90) days prior to the expiration date." (Weaver Aff. ¶ 4.) The Second Circuit has recognized that where there is extrinsic evidence suggesting that the parties intended the contractual provision at issue to be "administered in [an] unlawful manner," it "would be appropriate to consider that evidence when construing the clause." *See id.* "Contracts for an illegal purpose . . . are not enforceable." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982) ("It is also well established . . . that a federal court has a duty to determine whether a contract violates federal law before enforcing it."). Where, however, only a portion of the contract is illegal, and therefore unenforceable, "a court may nevertheless enforce the remainder of the contract." *Beth Israel Med. Ctr.*, 448 F.3d at 581.

If the assertions contained in the Weaver Affidavit – i.e., that the parties intended Article XV(2) to operate contrary to federal labor law – were determined to be true by a trier of fact, the net effect would be that Article XV(2) of the 2001 CBA is void and unenforceable as a matter of law. Thus, even if the case went to a jury and the jury found in favor of Conway on this issue, Conway could not rely on Article XV(2) as justification for its attempt to unilaterally withdraw

from the 2001 CBA prior to its expiration.

### C.     *Conclusion*

Plaintiffs have produced evidence – by citing other provisions of the 2001 CBA and pointing to extrinsic evidence regarding negotiations of both the 2001 CBA and the subsequent collective bargaining agreement, as well as past practice under the 2001 CBA – that support its position that Article XV(2) did not authorize any employer to unilaterally withdraw from or terminate the 2001 CBA prior to its expiration.  To the extent defendant has proffered contradictory evidence regarding the parties' intentions during contract negotiations, such evidence has demonstrated only that the Union and CTE may have intended Article XV(2) to operate in disaccord with federal labor law.  Thus, even if a jury were to credit defendant's evidence, defendant would not be entitled to judgment as a matter of law – the Court cannot enforce a contractual provision that is contrary to the law.  Defendant cites to Article XV(2) as the sole source of its contractual authority for unilaterally withdrawing from the 2001 CBA prior to its expiration; if that clause was stricken as illegal and unenforceable, it is undisputed that Conway could point to no other provision of the 2001 CBA to justify its attempted termination of the 2001 CBA.

Accordingly, the Court finds that Conway has failed to establish that it effectively terminated the 2001 CBA by virtue of its submission of the January 31, 2003 or April 1, 2003 Letters, and that plaintiffs are entitled to judgment as a matter of law on this issue.[3]

---

[3]     The Court rejects defendant's assertion that any of the Union's post-April 2003 conduct ratified Conway's attempt to withdraw from the 2001 CBA.  Defendant points to an April 6, 2004 letter, written by Union representative Michael Pavlick, which notified Union member Christopher Roe that "Conway Construction has failed to sign our current working agreement" and Roe was therefore subject to disciplinary action for being "employed by a non-

## *CONCLUSION*

For the reasons set forth above, plaintiffs' motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied.  Given the Court's conclusions that defendant was bound by the 2001 CBA for its entire term, i.e., through its expiration on April 30, 2006, and that Conway could not have terminated its obligations under the 2001 CBA, it appears that the only issue remaining is the amount of damages and other relief due to plaintiffs.  The parties are directed to confer and submit a briefing schedule on this issue within 45 days of the date of this Order.

**SO ORDERED.**


Dated: Central Islip, New York
       March 15, 2012                                 \_\_\_/s/_____
                                                      Denis R. Hurley
                                                      Unites States District Judge

---

union contractor." (Conway Aff., Ex. D.)  To the extent that Pavlick's isolated reference to Conway as a "non-union contractor" in a letter that was sent to someone other than Conway has any relevant legal impact, Conway has failed to demonstrate that Pavlick had any authority to bind the Union.  The other incidents of Union conduct cited by defendant occurred after the April 30, 2006 expiration of the 2001 CBA and are, thus, irrelevant to the question of whether the Union acquiesced to Conway's attempted withdrawal from the 2001 CBA.